UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

GLENDA PALMER, *et al.,*            )
            Plaintiffs,            )     2:09-cv-01791 JWS
         vs.            )     ORDER AND OPINION
STATE OF ARIZONA, *et al.,*            )     [Re: Motion at Docket 175]
           Defendants.            )

## I.  MOTION PRESENTED

At docket 175, defendants the State of Arizona, Preston Gamblin ("Gamblin"), and Ronald Carlson ("Carlson"; collectively "defendants") move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs Glenda Palmer, Danielle Lucero, and Leroy L. Lucero (collectively "plaintiffs") oppose the motion at docket 198.  Defendants' reply is at docket 210.  Oral argument was not requested and would not assist the court.

## II.  BACKGROUND

Timothy Lucero was stabbed to death while in the custody of the Arizona Department of Corrections ("ADC").  As of December 2008, Lucero was held in Special Management Unit 1 ("SMU-1") at the Arizona State Prison Complex ("ASPC")- Eyman.  Gamblin was a correction officer at ASPC-Eyman assigned to the Special Security Unit

("SSU"), which was responsible for collecting information on prison gangs.  Carlson was a sergeant at ASPC-Eyman.  In May 2008, Lucero was transferred to the Cimarron Unit at ASPC-Tuscon.  He was murdered there on September 4, 2008.

Prior to Lucero's transfer, on January 11, 2008, Lucero's sister-in-law, Paula, contacted Jerry Dunn, a supervisor at ADC, after receiving letters from Lucero in which he expressed concern for his safety.  Dunn contacted a supervisor at SMU-1, and Gamblin interviewed Lucero on January 25, 2008.  Gamblin reported that Lucero told him he was a member of the Aryan Brotherhood gang and that he had refused an order to kill another inmate, Christopher Wathen ("Wathen").[1]  Wathen was ultimately murdered by another inmate.  Gamblin also reported that, because he refused the order, Lucero "had many individuals inform him that he [was] going to get the same fate."[2]  Carlson reviewed Gamblin's interview report.  Plaintiffs maintain that Gamblin or Carlson should have placed Lucero in protective segregation but did not.

On January 31, 2008, Lucero was interviewed by a Yuma County Attorney and special investigator Henry Ross ("Ross").  Gamblin accompanied Lucero to the interview.  Plaintiffs maintain that Gamblin was present during the interview and was therefore aware of its substance.  Gamblin recalls only guarding the door.  In any event, a transcript of the interview reflects that Gamblin interjected towards the beginning of the interview and Ross and Lucero both reference Gamblin as though he were present.[3]  At the interview, Lucero stated repeatedly that his life was in danger.[4]

On February 27, 2008, Chief Criminal Deputy Yuma County Attorney Roger Nelson ("Nelson") wrote a letter to Ross in which he stated that the Yuma County Attorney's Office believed that Lucero was in danger and needed to be transferred to a

---

[1]Doc. 199-1 at 57.

[2]*Id.*

[3]*Id.* at 70, 71, 104.

[4]*See, e.g.*, *id.* at 97–98.

1  prison outside Arizona.  On March 5, 2008, Ross faxed the letter to Robert Stewart
2  ("Stewart")[5], who was the warden at ASPC-Eyman.  It is disputed whether the letter was
3  faxed from Stewart's office to Deputy Warden Tara Diaz ("Diaz") on the same day.  On
4  March 22, 2008, Stewart e-mailed Diaz to follow-up.  Diaz was unaware of the letter.  In
5  a subsequent communication, Diaz erroneously told Stewart that Lucero was in
6  protective segregation.

7  On March 26, 2008, Lucero was reclassified to a lower custody level, and in May
8  he was transferred to ASPC-Tuscon.  He was murdered there on September 4, 2008.

9  Glenda Palmer is Lucero's mother.  She filed suit on behalf of Lucero's estate,
10  along with Lucero's father and daughter, in Arizona state court in July 2009.  The case
11  was almost immediately removed to federal court.  Plaintiffs asserted claims pursuant to
12  42 U.S.C. §§ 1983 and 1985 and various common law torts.  The only remaining claims
13  against the moving defendants are 42 U.S.C. § 1983 claims against Gamblin and
14  Stewart, recklessness and gross negligence claims against the State of Arizona, and
15  claims for punitive damages.[6]

16  ### III.  STANDARD OF REVIEW

17  Summary judgment is appropriate where "there is no genuine dispute as to any
18  material fact and the movant is entitled to judgment as a matter of law."[7]  The materiality
19  requirement ensures that "only disputes over facts that might affect the outcome of the
20  suit under the governing law will properly preclude the entry of summary judgment."[8]
21  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable

22
23
24  _____

25  [5]Stewart is also a defendant to this action.

26  [6]Doc. 53.

27  [7]Fed. R. Civ. P. 56(a).

28  [8]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1  jury could return a verdict for the nonmoving party."[9]  In resolving a motion for summary
2  judgment, a court must view the evidence in the light most favorable to the non-moving
3  party.[10]  The reviewing court may not weigh evidence or assess the credibility of
4  witnesses.[11]  The burden of persuasion is on the moving party.[12]

5  **IV.  DISCUSSION**

6  **A.  Plaintiffs' 42 U.S.C. § 1983 Claims**

7          Plaintiffs' 42 U.S.C. § 1983 claims against Gamblin and Stewart are premised on
8  an alleged violation of the Eighth Amendment.  "Prison officials have a duty to protect
9  prisoners from violence at the hands of other prisoners."[13]  A failure to fulfill that duty
10 violates the Eighth Amendment if the deprivation alleged is "sufficiently serious" and the
11 product of "deliberate indifference" on the part of the prison official.[14]  Deliberate
12 indifference is akin to recklessness.[15]  It is established where the prison official is "aware
13 of facts from which the inference could be drawn that a substantial risk of serious harm
14 exists, and he . . . draw[s] the inference."[16]

15         **1. Claim Against Gamblin**

16         Defendants argue that plaintiffs are unable to establish that Gamblin was
17 deliberately indifferent to an excessive risk to Lucero's safety.  Defendants concede that
18 Gamblin was aware of Lucero's situation–and presumably that the Aryan Brotherhood

19

20 [9]*Id.*

21 [10]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

22 [11]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

23 [12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

24
25 [13]*Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

26 [14]*Farmer*, 511 U.S. at 834.

27 [15]*Id.* at 836.

28 [16]*Id.* at 837.

1   might seek retribution[17]–based on his interview of Lucero.  Defendants maintain,

2   however, that Gamblin believed that Lucero was safe at SMU-1, and therefore he could

3   not have been deliberately indifferent to Lucero's safety.[18]  The problem with

4   defendants' contention is that the standard for deliberate indifference concerns only

5   facts giving rise to the inference of a substantial risk of serious harm and whether that

6   inference was actually drawn.  Here, plaintiffs have presented evidence that Gamblin

7   was aware of facts giving rise to an inference of a substantial risk of serious harm to

8   Lucero.[19]  A reasonable jury could also conclude that Gamblin drew that inference.[20]

9       Defendants' argument is premised on an explanation of Gamblin's response to

10  the risk of serious harm to Lucero.  A belief that Lucero was safe is one possible

11  explanation for Gamblin's decision not to pursue protective segregation, but the facts

12  are such that the jury might instead conclude that Gamblin was simply indifferent to

13  Lucero's safety.

14      Gamblin maintains that he "believed that the purpose of [his] interview with

15  Lucero was to obtain gang-related information about him and the Wathen murder."[21]

16  Even if that is true, it has no bearing on his understanding of Lucero's subsequent

17  interview.  Because plaintiffs have presented evidence supporting the proposition that

18

19      [17]Gamblin stated in a declaration that "[a]lthough Lucero told me that he would suffer the
20  same fate as inmate Wathen because he refused to assault Wathan, because Lucero was
    housed in SMU I, I did not find it unusual or troubling that he was not concerned for his safety."
21  Doc. 176-1 at 39.

22      [18]*Id.* (Gamblin's declaration indicates he "believe[d] SMU I [was] the safest place for an
    inmate in the Arizona State prison system.").
23

24      [19]For instance, the information report concerning Gamblin's interview of Lucero noted
    Lucero's statement that he would be killed for providing information to authorities regarding
25  Wathen's murder.  Doc. 199-1 at 61.

26      [20]At Gamblin's deposition he agreed that the Aryan Brotherhood prison gang had been
    known to murder witnesses, and that someone who informed on a member of the Aryan
27  Brotherhood could be in mortal danger.  *Id.* at 69.

28      [21]Doc. 176-1 at 37.

1   Gamblin actually drew an inference that a substantial risk of serious harm to Lucero
2   existed, and because Gamblin's alleged belief that Lucero was safe in SMU-1 might not
3   be consistent with the jury's evaluation of the evidence, Gamblin is not entitled to
4   summary judgment.

5         **2. Claim Against Carlson**

6         Defendants maintain that, because there is no vicarious liability under § 1983,
7   plaintiffs' evidence is insufficient to support a § 1983 claim against Carlson.[22]
8   Specifically, defendants argue that the only evidence potentially supporting a § 1983
9   claim against Carlson is evidence that he reviewed Gamblin's information report.
10  Plaintiffs maintain that evidence that Carlson reviewed the report is sufficient to support
11  a finding of deliberate indifference.  Plaintiffs note that Carlson wrote on the IR report
12  that "[v]alidation packet [was] in progress,"[23] but the validation process was never
13  started, and the report was never entered into the database.  Consequently, plaintiffs
14  argue, ASPC-Tucson had no record of the death threats against Lucero.

15        The validation process was a method of confirming membership in a prison
16  gang.[24]  If the validation process were in any way similar to the process for putting an
17  inmate into protective segregation, then plaintiffs' argument would have more force.
18  Plaintiffs' evidence establishes, at best, that Carlson was aware of facts from which an
19  inference that a substantial risk of serious harm existed could be drawn.  There is no
20  evidence that Carlson actually drew that inference.  In a declaration, Carlson stated that
21  he believed that Lucero's meeting with the Yuma County Attorney's Office was gang-
22  related and that he was not told the actual purpose of the meeting.[25]  Plaintiffs have not
23  presented any evidence that he was aware of the substance of Lucero's subsequent

24  _____

25  [22]*See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

26  [23]Doc. 199-1 at 57.

27  [24]*See, e.g.*, doc. 176-1 at 38, 48.

28  [25]*Id.* at 49.

-6-

1  interview.  Because there is no evidence that Carlson actually drew an inference that a
2  substantial risk of serious harm to Lucero existed, summary judgment in Carlson's favor
3  is appropriate with respect to the § 1983 claim against him.

4  **B. Qualified Immunity**

5          "An officer will be denied qualified immunity in a § 1983 action only if (1) the facts
6  alleged, taken in the light most favorable to the party asserting injury, show that the
7  officer's conduct violated a constitutional right, and (2) the right at issue was clearly
8  established at the time of the incident such that a reasonable officer would have
9  understood her conduct to be unlawful in that situation."[26]  District courts may exercise
10 "discretion in deciding which of the two prongs of the qualified immunity analysis should
11 be addressed first."[27]

12         Because plaintiffs have not provided evidence sufficient to conclude that Carlson
13 was deliberately indifferent, the only question is whether Gamblin is entitled to qualified
14 immunity.  Here, taken in the light most favorable to plaintiffs, the facts suggest that
15 Gamblin inferred that Lucero's life was in danger.  Deliberate indifference to Lucero's
16 safety would have violated Lucero's Eighth Amendment rights, and Gamblin would have
17 been aware that deliberate indifference to Lucero's safety was unlawful.

18         Defendants argue that Gamblin was performing non-discretionary acts in good
19 faith, pursuant to a policy instituted by his superiors.[28]  Although defendants argue that
20 "the [protective segregation] process was only required if the inmate requested it or if
21 the officers felt he was in danger,"[29] that characterization does not comport with the
22 language of the ADC memorandum that describes ADC policy.  That policy provides
23 that "[a]ny staff member who receives a written or verbal request from an inmate for

24  _____

25 [26] *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011).

26 [27] *Pearson*, 555 U.S. at 236.

27 [28] Doc. 175 at 11.

28 [29] Doc. 210 at 6.

-7-

1  protection *or who becomes aware of a threat to an inmate* shall immediately isolate the
2  inmate in a safe, reasonably secure area and notify the Shift Commander,"[30] and that
3  the process would continue from there.  Consequently, even if the court were to accept
4  defendants' statement of the law, it is not clear that Gamblin acted pursuant to ADC
5  policy.

6        Because Gamblin would have known that deliberate indifference to Lucero's
7  safety was unlawful, he is not entitled to qualified immunity.

8  **C.  Estate's § 1983 Claim for Pain & Suffering**

9        Defendants argue that a § 1983 claim for pain and suffering is unavailable to
10  Lucero's estate, because Arizona's survival statute excludes claims for pain and
11  suffering.  Section 1983 does not specify the remedies available to a successful
12  claimant.  Section 1988 instructs courts to apply "the common law, as modified and
13  changed by the constitution and statutes of the State wherein the court having
14  jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent
15  with the Constitution and laws of the United States."[31]

16        The relevant statute–Arizona Revised Statute § 14-3110–provides that many
17  causes of action "shall survive the death of the person entitled thereto or liable therefor,
18  and may be asserted by or against the personal representative of such person, provided
19  that upon the death of the person injured, *damages for pain and suffering of such*
20  *injured person shall not be allowed.*"[32]  The question is whether Arizona's survival
21  statute is consistent with federal law.

22        In *Gotbaum v. City of Phoenix*, the court noted that "[a] clear majority of federal
23  cases . . . conclude[] that when a violation of federal civil rights results in death of the
24  victim, state statutes limiting the remedies of the victim's estate and family members are

---

26  [30]Doc. 176-1 at 14 (emphasis added).

27  [31]42 U.S.C. § 1988; *see also Robertson v. Wegmann*, 436 U.S. 584, 588–89 (1978).

28  [32]A.R.S. § 14-3110 (emphasis added).

1    not consistent with the purposes of section 1983."[33]  The court adopted the majority

2    position and concluded that § 14-3110 is inconsistent with § 1983.

3          Defendants argue that *Gotbaum* is not binding and that other district courts within

4    the Ninth Circuit have found statutes precluding representatives of a victim's estate from

5    seeking damages for pain and suffering to be consistent with § 1983.[34]  Although

6    defendants are correct that *Gotbaum* is not binding precedent, the court sees no reason

7    to depart from the majority view when it has already been adopted and applied in this

8    district.

9          Finally, defendants argue that there is no evidence that Lucero suffered.  The

10   court agrees with plaintiffs that the testimony of Lisa Johnson provides evidence of

11   suffering.  She testified that Lucero was alive when she arrived at the scene of his

12   death, that his eyes had been stabbed out, and that he was unrecognizable.[35]

13   Summary judgment in defendants' favor is therefore inappropriate on the issue of

14   whether damages for pain and suffering are available to Lucero's estate.

15   **D.  Lucero's Family Members' § 1983 Claim**

16         Defendants argue that Lucero's family members' § 1983 claim fails as a matter of

17   law.  In *Kelson v. City of Springfield*, the Ninth Circuit determined "that a parent has a

18   constitutionally protected liberty interest in the companionship and society of his or her

19   child" and that a "state's interference with that liberty interest without due process of law

20   is remediable under section 1983."[36]  "To amount to a violation of substantive due

21   process . . . the harmful conduct must shock the conscience or offend the community's

22

23         [33]617 F. Supp. 2d 878, 884 (D. Ariz. 2008).

24         [34]Doc. 175 at 13.  For instance, in *Venerable v. City of Sacramento*, 185 F. Supp. 2d
25   1128, 1131–33 (E.D. Cal. 2002), the Eastern District of California concluded that a California
     statute which forbade recovery of damages for pain and suffering damages by a decedent's
26   representative was consistent with federal law.

27         [35]Doc. 199-1 at 193–94, 195–96.

28         [36]767 F.2d 651, 655 (9th Cir. 1985).

sense of fair play and decency."[37]  Defendants argue that none of the alleged conduct shocks the conscience or offends senses of fair play and decency.

Some Ninth Circuit precedent suggests that the test is not whether the harmful conduct shocks the conscience, but rather whether the state actors "acted with deliberate indifference to the . . . rights of familial relationship and society."[38]  Other Ninth Circuit precedent suggests that the standard is neither whether the defendant's conduct shocks the conscience nor whether the defendant was deliberately indifferent, but instead that "[t]he standard for deprivation of familial companionship is 'unwarranted interference'" with the parent-child relationship.[39]

Apart from the confused state of the applicable standard when a plaintiff attempts to vindicate their liberty interest in companionship with a deceased child, there is another threshold issue.  Specifically, it is unclear whether that liberty interest survives a deprivation of the child's liberty that was consistent with due process.  In this case, whether the liberty interest in companionship of Lucero's parents survived Lucero's conviction and incarceration after due process was afforded.  Because the liberty interest belongs to the parents, the court will proceed as though the interest survives a constitutional deprivation of the child's liberty.

Assuming that the appropriate test is the test most recently applied by a Ninth Circuit panel, the question is whether Gamblin's alleged conduct shocks the conscience or offends the community's sense of fair play and decency.[40]  Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that a failure to place Lucero in protective segregation offends a sense of fair play and decency.

---

[37]*Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011).

[38]*Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998), *superseded by statute on other grounds.  See also Venerable*, 185 F. Supp. 2d at 1131.

[39]*Crowe v. County of San Diego*, 608 F.3d 406, 441 & n.13 (9th Cir. 2010) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)).

[40]*Rosenbaum*, 663 F.3d at 1079.

1   Consequently, summary judgment is inappropriate with respect to Lucero's parents'
2   claim for loss of companionship under § 1983.

3   **E.  Plaintiffs' Gross Negligence Claims Against the State**

4       Defendants argue that there is no evidence that any employee or agent of the
5   State of Arizona was grossly negligent.  Gross negligence is established when a party
6   acts or fails to act with knowledge of or reason to know facts which would lead a
7   reasonable person to conclude that the party's conduct creates an unreasonable risk of
8   harm and involves a high degree of probability that substantial harm will result.[41]

9       **1. Dunn**

10      Defendants argue that plaintiffs have not presented evidence that Dunn, who
11  was the supervisor of the Security Threat Group, was grossly negligent.  Plaintiffs
12  maintain that Dunn spoke with Lucero's sister-in-law, Paula, on numerous occasions,
13  and was informed of the danger to Lucero, but he never verified that Lucero was in
14  protective custody.  Dunn did respond to Paula's concerns–he contacted a supervisor at
15  SMU-1 and ultimately Gamblin interviewed Lucero.  Even though Gamblin "believed that
16  the purpose of [his] interview with Lucero was to obtain gang-related information about
17  him and the Wathen murder,"[42]–which does not correspond to a concern for Lucero's
18  safety–there is no evidence that Dunn was aware of the severity of the threat to
19  Lucero's safety, and thus, that his inaction created an unreasonable risk of harm and
20  involved a high probability that substantial harm would result.

21      **2. Gamblin**

22      Because deliberate indifference is a higher standard than gross negligence, and
23  because the court has determined that a reasonable jury could conclude that Gamblin
24  was deliberately indifferent, plaintiffs' allegations against Gamblin are also sufficient to
25  establish gross negligence.

26

27      [41]*Nichols v. Baker*, 416 P.2d 584, 585 (1966).

28      [42]Doc. 176-1 at 37.

1

### 3. Stewart

2
3
4

The court has also determined that a reasonable jury could conclude that Stewart was deliberately indifferent.[43]  Plaintiffs' allegations against Stewart are therefore sufficient to constitute gross negligence as well.

5

### 4. Diaz

6
7
8
9
10
11
12
13

Defendants maintain that there is insufficient evidence to conclude that Diaz was grossly negligent.  Plaintiffs argue that Diaz mistakenly informed Stewart that Lucero was in protective segregation.  Despite Diaz's error, the evidence does not support a conclusion that Diaz was aware of facts from which a reasonable person would conclude that her conduct involved an unreasonable risk of harm and a high probability that substantial harm would result.  To the contrary, Diaz's responses to Stewart's inquiry indicate that she was unaware of Lucero's situation.[44]  Because Diaz was unaware of the underlying facts, she could not have been grossly negligent.

14

### 5. Johnson

15
16
17
18
19

Plaintiffs maintain that Johnson "was informed [during] the weeks prior to Lucero's death that he would be murdered."[45]  Neither the paragraph in plaintiffs' statement of facts to which plaintiffs cite, nor the portions of Johnson's deposition underlying it support plaintiffs' contention.  Plaintiffs have therefore not provided any evidence that Johnson was grossly  negligent.

20
21
22
23
24
25

26
[43]Doc. 220 at 4–6.

27
[44]Doc. 168-1 at 34.

28
[45]Doc. 198 at 25.

1        **6. Bittman**

2        Plaintiffs do not dispute that the allegations against former defendant Christopher

3   Bittman are not relevant to their gross negligence claim.[46]

4   **F. Causation**

5        Defendants argue that Lucero's failure to take any action on his own

6   behalf–specifically, by requesting protective segregation–was a superseding cause of

7   his death.  "A superseding cause, sufficient to become the proximate cause of the final

8   result and relieve defendant of liability for his original negligence, arises only when an

9   intervening force was unforeseeable and may be described, with the benefit of

10  hindsight, as extraordinary."[47]  "Ordinarily, the question of proximate cause is a question

11  of fact for the jury."[48]

12       Defendants maintain that the "entire prison [protective segregation] system is

13  built upon the unassailably logical assumption that inmates will act in their own self-

14  interest to protect themselves" by "tell[ing] someone when they feel threatened."[49]  As

15  discussed above, defendants' argument is contradicted by the memorandum outlining

16  ADC protective segregation policy.[50]  The fact that awareness of a threat to an inmate's

17  safety was sufficient to trigger the protective segregation process significantly undercuts

18  defendants' argument.  Moreover, defendants' argument would itself undercut the

19  overarching duty of prison officials to protect inmates from violence at the hands of

20  other prisoners.  If officials could subvert that duty by placing the responsibility back on

21  the inmates, there would be no duty left to discharge.  Finally, it is foreseeable that an

22  inmate might not request protective segregation even if they were seriously threatened

23  _____

24       [46]The claims against Bittman have been dismissed.  Doc. 53.

25       [47]*Robertson v. Sixpence Inns of America*, 789 P.2d 1040, 1047 (Ariz. 1990).

26       [48]*Id.*

27       [49]Doc. 175.

28       [50]Doc. 176-1 at 14 (emphasis added).

1  and therefore, even if Lucero did not request protective segregation, his failure to act
2  was not a superseding cause of his death.

3  **G. Estate's Claim for Damages**

4          Defendants argue that Lucero's estate may not recover damages for estate
5  expenses, loss of earnings, or loss of enjoyment of life.  Plaintiff responds that the
6  estate is permitted to recover damages for pre-death pain and suffering–which has
7  already been discussed above–and also that "the Estate has a valid claim for expenses
8  of the Estate, funeral expenses and loss of earnings for Lucero."[51]  Plaintiffs do not
9  support the latter assertion.

10         The court agrees with and adopts the reasoning of *Gandy v. United States*,[52]
11 insofar as recovery loss of future income under Arizona's survival statute is limited to
12 the time period between the time of Lucero's injury and his death.  Defendants are
13 correct that the Arizona Court of Appeals has determined that damages for a loss of
14 enjoyment of life are precluded by the survival statute.[53]  Finally, plaintiffs have not
15 disputed defendants' contention that they have not produced any evidence of any estate
16 expenses.

17 **H. Punitive Damages**

18         Defendants argue that punitive damages may not be awarded against the State
19 of Arizona if plaintiffs' state law claims are successful.  Plaintiffs do not respond to
20 defendants' argument.  Arizona Revised Statute § 12-280.04 provides that "[n]either a
21 public entity nor a public employee acting within the scope of his employment is liable
22 for punitive or exemplary damages."[54]  Therefore, summary judgment is appropriate in

23

24 _____

25 [51]Doc. 198.

26 [52]437 F. Supp. 2d 1085, 1089 (D. Ariz. 2006).

27 [53]*Quintero v. Rogers*, 212 P.3d 874, 878 (Ariz. Ct. App. 2009).

28 [54]A.R.S. § 12-820.04.

-14-

1  defendants' favor on the issue of punitive damages in the context of plaintiffs' state law

2  claims.

3       Defendants also argue that plaintiffs are not entitled to punitive damages

4  stemming from their § 1983 claims.  Punitive damages may be assessed for claims

5  under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or

6  intent, or when it involves reckless or callous indifference to the federally protected

7  rights of others."[55]  "[T]his threshold applies even when the underlying standard of

8  liability for compensatory damages is one of recklessness."[56]  Because deliberate

9  indifference is similar to recklessness, if plaintiffs successfully establish at trial that

10 Gamblin and Stewart were deliberately indifferent, then they will likely be entitled to

11 punitive damages.

12                          **V.  CONCLUSION**

13       For the reasons above, defendants' motion for summary judgment at docket 175

14 is **GRANTED** in part and **DENIED** in part as follows:

15       1) It is granted with respect to plaintiffs' § 1983 claims against Carlson.

16       2) It is granted with respect to plaintiffs' state law claims for punitive damages.

17       3) It is denied with respect to plaintiffs' § 1983 claims against Gamblin.

18       4) It is denied with respect to plaintiffs' claims for punitive damages and damages

19 for pain and suffering under § 1983.

20       5) It is denied with respect to plaintiffs' § 1983 claims for loss of companionship.

21       6) It is denied with respect to plaintiffs' gross negligence claims against the State

22 of Arizona.

23       Given the rulings in this order and the court's earlier decisions, the claims

24 remaining for resolution in this case are plaintiffs' § 1983 claims against Gamblin and

25 Stewart, which include those premised on violations of the Eighth and Fourteenth

26 _____

27    [55]*Smith v. Wade*, 461 U.S. 30, 56 (1983).

28    [56]*Id.*

Amendments, and plaintiffs' gross negligence and wrongful death claims against the State of Arizona.

DATED this 10th day of May 2012.

_____
/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE